STEVEN G. KALAR
Federal Public Defender
Northern District of California
SOPHIA WHITING
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:    (415) 436-7706
Email:         Sophia_Whiting@fd.org


Counsel for Defendant Gamez-Medina


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** 19-395 SI |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| ANEXI GAMEZ-MEDINA, | **Court:** Courtroom 1, 17th Floor |
| Defendant. | **Hearing Date:** February 28, 2020 |
| | **Hearing Time:** 11:00 a.m. |

**INTRODUCTION**

On November 26, 2019, Anexi Gamez-Medina accepted responsibility for selling $16 worth of cocaine to an undercover police officer and for the drugs he was carrying. For this, he has already served six months. Mr. Gamez-Medina deeply regrets his involvement in drugs, which has hurt his loved ones and destroyed any hope for a future he had in this country with his partner and young daughter. In light of Mr. Gamez-Medina's incredibly difficult background, his own struggle with addiction, and his inevitable deportation, Mr. Gamez-Medina respectfully requests that the Court vary downward under the factors of 18 U.S.C. § 3553(a) and impose upon him a sentence of time served (effectively six months).

## BACKGROUND

Anexi Gamez-Medina was born on April 29, 1993, and grew up in a poverty-stricken area of Francisco, Morazán, Honduras. His parents separated when he was a baby. *See* PSR ¶ 37. Mr. Gamez-Medina grew up in an overcrowded two-bedroom home, which had no electricity, with 12 siblings, his mother, grandmother, uncle and nephews. *See id.* ¶¶ 36-37. Although his mother worked hard to provide for their family, they often went without clothing and basic necessities. *See id.* ¶ 37. Mr. Gamez-Medina sporadically attended school, only when his family could afford to buy school supplies. *See id.* ¶ 38.

As one of the oldest siblings, Mr. Gamez-Medina did not have the freedom to spend his days playing, but rather was shuffled into the position of caretaker at a young age. *See id.* Mr. Gamez-Medina began working in the fields at the age of nine to support his family. *See id.* He placed aside his goal of becoming a veterinarian and formally dropped out of school in ninth grade because his mother again became pregnant and relied on him to work even more to support the growing family. *See id.* ¶ 48. Mr. Gamez-Medina experienced great difficulty with finding work, and he only made about five dollars per hour after working nine-hour days. *See id.* ¶ 39.

At the same time, living in Honduras was violent. *See* PSR ¶ 39. The capital city of Tegucigalpa has become one of the most violent cities in the world. *See, e.g., Central America Refugee Crisis*, United Nations Refugee Agency, https://www.unrefugees.org/emergencies/central-america. In fact, in 2016, Francisco Morazán had the third highest homicide rate in the country, with 1,129 homicides, or a rate of 71.6 homicides per 100,000 inhabitants. *See, e.g., Honduras: Information Gathering Mission Report*, Immigration and Refugee Board of Canada, https://irb-cisr.gc.ca/en/country-information/ndp/Pages/Honduras-2018P1.aspx.

During his adolescence, Mr. Gamez-Medina faced serious threats to his life from the local gang controlling his community. Mr. Gamez-Medina knew classmates at school who were severely harmed for refusing to join the gang. Worried that he would be the next target of this violence, Mr. Gamez-Medina decided to make the dangerous journey north at just 17 years of age. *See* PSR ¶ 39. He also hoped to better financially support his siblings' education and to pay medical expenses from his grandmother's diabetes and mother's lung problems. *See id.* ¶¶ 39, 41.

1  With little education or parental guidance, and the stress of being a caretaker while receiving

2  regular threats of violence, Mr. Gamez-Medina started abusing alcohol and drugs at a young age. He

3  began drinking to intoxication on a daily basis at 16 years old and using cocaine twice a week at 17.

4  *See id.* ¶ 47. In recent years, he additionally developed a habit of smoking marijuana daily. *See id.*

5  Mr. Gamez-Medina never received treatment for his addictions.

6  When he arrived in the United States as a juvenile, Mr. Gamez-Medina struggled to find long-

7  term employment and to earn a livable wage. He worked in construction in Oakland for one and a

8  half years, earning $100 per day. Before the instant arrest, he was working as a Best Buy delivery

9  driver for four months, earning $80 per day. *See id.* ¶ 51. But without an education, steady income,

10 the ability to pay rent, or anyone to turn to for help in the United States, Mr. Gamez-Medina made the

11 regrettable decision to get involved with small hand-to-hand sales of drugs to support his family and

12 substance use habits. Despite his drug addiction and unstable living conditions, Mr. Gamez-Medina

13 still managed to send money home to his family in Honduras and provide for his partner and five-

14 year-old daughter in the United States. *See id.* ¶¶ 40; 42.

15 Mr. Gamez-Medina's record reflects his difficult background and his addiction. In his late teens

16 and early twenties, Mr. Gamez-Medina committed drug offenses and was deported three times. *See*

17 *id.* ¶¶  24-26; 31-33. However, Mr. Gamez-Medina's most recent conviction and deportation are

18 both from over five years ago. *See id.* ¶¶ 25-26; 33. He has never had the opportunity to receive drug

19 treatment or rehabilitation services, likely due to his undocumented status. He has never been arrested

20 or convicted of a violent offense. He is a loving father and partner who has made mistakes. *See*

21 Declaration of Sophia Whiting ("Whiting Declaration"), Exhibits B, C.

22 On July 29, 2019, Mr. Gamez-Medina was arrested for selling just $16 worth of cocaine base.

23 When officers searched him, they found additional drugs packaged consistently with small hand-to-

24 hand sales and personal use. He was released that same day. Since he happened to be arrested after

25 the government began their Federal Initiative for The Tenderloin ("FITT"), on August 22, 2019, the

26 government filed a federal indictment charging Mr. Gamez-Medina with drug possession and

27 distribution. He was arrested on the federal warrant on September 1, 2019, and has since been in

28 custody.

**DISCUSSION**

**I.    The Sentencing Guidelines (18 U.S.C. § 3553(a)(4))**

Mr. Gamez-Medina agrees with the government and U.S. Probation that the applicable Offense Level is 10 and that his calculated Criminal History Category is IV. Mr. Gamez-Medina respectfully requests consideration, however, of a downward departure of his Criminal History Category to III under 4A1.3(b), which allows for a downward departure if the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes. Mr. Gamez-Medina only qualifies for Category IV by one point. Yet, he received two points for a 60-day jail sentence, which is right on the cusp between one and two points. Had he received just one day less, he would be in Category III. His longest sentence, for a drug possession offense, is from 2011 and gives him three points. His only other conviction is immigration related. Furthermore, as the PSR notes, none of Mr. Gamez-Medina's prior convictions or arrests are violent in nature. His adjusted guidelines imprisonment range should be 10-16 months, accordingly.

Although the Court must remain mindful of the guideline recommendation, the range established by the Sentencing Guidelines is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court's paramount concern must be to '"impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment." *Carty*, 520 F.3d at 991. A sentence of time served and three years' supervised release better aligns with the goals and factors of section 3553(a), for the reasons below.

Under the applicable 18 U.S.C. § 3553(a) factors, a sentence of time served is sufficient, but not greater than necessary, due to Mr. Gamez-Medina's particularly difficult background, as well as the reality that Mr. Gamez-Medina will be detained by immigration officials and deported.

## II.     The Nature and Circumstances of the Offense and History and Characteristics of Mr. Gamez-Medina Warrant a Sentence of Time Served (18 U.S.C. § 3553(a)(1))

As set forth in the Background section above, Mr. Gamez-Medina first came to the United States from Honduras because the violence there was threatening to take his life and he could not fulfill the caretaker role he was cast into at an early age given limited employment opportunities. Although this reality does not excuse Mr. Gamez-Medina's criminal conduct, it does provide a critical perspective, especially considering the role in creating those violent and impoverished conditions in Honduras played by the same federal government prosecuting him here.

Honduras is a dangerous and violent country with one of the highest murder rates in the world. *See Honduras 2018 Crime & Safety Report*, Overseas Security Advisory Council, https://www.osac.gov/Pages/ContentReportDetails.aspx?cid =23798); *see also Gangs in Honduras*, Insight Crime, https://www.insightcrime.org/images/PDFs/2015/HondurasGangs.pdf at 1 ("In 2014, Honduras was considered the most violent nation in the world that was not at war."). Tegucigalpa, the capital of Honduras, and San Pedro Sula, the country's economic center, are two of the ten most dangerous cities in the world. *Central America Refugee Crisis*, *supra*; *see also Gangs in Honduras*, *supra*, at 1. According to the 2017 State Department Human Rights Report, violence in Honduras includes "murder, extortion, kidnapping, torture, human trafficking, intimidation, and other threats." *Country Report of Human Rights Practices for 2017, Honduras*, U.S. DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS AND LABOR, https://www.state.gov/documents/organization/277585.pdf, at 1.

Although there are many reasons for the high crime and murder rates, political instability and gang activity have contributed to the violence for decades. In the 1980's, the United States used Honduras to base American soldiers as they fought against the Nicaraguan government. *Id.* Neighboring countries Guatemala and El Salvador also endured internal wars that left the countries unstable. *Id.* Because many were left unemployed and weapons were readily available, criminal groups began to form throughout Central America. *Id.* According to the Wilson Center, and as directly experienced by Mr. Gamez-Medina, crime generally goes unreported because of corruption, weak law enforcement, and active criminal groups. *See* Cristina Eguizábal et al., *Crime and Violence in Central America's Northern Triangle*, WILSON CTR RPT. ON AMERICAS,

1    https://www.wilsoncenter.org/sites/default/files/FINAL%20PDF_CARSI%20REPORT_0.pdf at 1-2.

2    In 2009, a military coup ousted Honduras President Zelaya making Honduras the first Central

3    American country to undergo a coup in nearly two decades, and in 2017, the most recent Honduran

4    presidential election came under question as many organizations noticed irregularities with the

5    results. *See* Central America's Violent Northern Triangle; *see also Honduras: Guarantee Credibility*

6    *of Elections, Protect Free Expression*, HUMAN RIGHTS WATCH (Dec. 2017),

7    https://www.hrw.org/news/2017/12/11/honduras-guarantee-credibility-elections-protect-free-

8    expression). Because of the instability and unrest within Honduras, the United States has issued

9    warnings cautioning travel there since 2012. *See 2018 Crime & Safety Report*, *supra*. These travel

10   warnings are indicative of the safety concerns in the country and why many are fleeing in hopes of

11   creating more sustainable lives.

12          Gang violence is also responsible for the violence throughout Honduras. Since the 1990's, the

13   United States has played a significant role in Honduran gang culture. *See Gangs in Honduras*, *supra*,

14   at 1. Mara Salvatrucha (MS-13), the 18th Street gang (M-18), and Barrio 18, three gangs that

15   originated in Los Angeles, are now three of the most prevalent gangs in the country. *See* Clare

16   Ribando Seelke, *Gangs in Central America*, CONG. RES. SERV., 3 (Aug. 29, 2016),

17   https://fas.org/sgp/crs/row/RL34112.pdf); *see also Gangs in Honduras* at 1. These gangs expanded

18   into Honduras after the United States passed legislation in 1996 that led to the deportation of many

19   undocumented immigrants with criminal records. *See Gangs in Honduras*, *supra*, at 1. Although

20   sources vary as to how many gang members are currently active, estimates range between 5,000 to

21   36,000 members. *Id.* at 7. These U.S.-based gangs, along with local gangs, use extortion and violence

22   to control territories and comminutes. *See* Crime and Violence at 1-2; *see also* Rocio Cara Labrador

23   & Danielle Renwick, *Central America's Violent Northern Triangle*, COUNCIL ON FOREIGN REL. (June

24   26, 2018), https://www.cfr.org/backgrounder/central-americas-violent-northern-triangle. As a result,

25   life in Honduras is tenuous, and violence is a primary reason why many people, including Mr.

26   Gamez-Medina, flee the country in order to find a life where they can be safe and find economic

27   opportunity. *See id.*

28          Prior to arriving in the United States, Mr. Gamez-Medina became vulnerable to using

substances to cope with the dangerous and impoverished environment that engulfed him in Honduras. He began with heavy drinking, then using marijuana and cocaine. This crutch was exacerbated upon his arrival to the United States, where Mr. Gamez-Medina was vulnerable to continued involvement with drugs—both using and low-level dealing—because of the trauma he carried with him, lack of education, extreme poverty, exclusion from lawful employment, and lack of community. In his addiction and desperation to continue to find a way to support his family's expenses, Mr. Gamez-Medina made the regrettable decision to sell drugs.

While culpable for his actions, Mr. Gamez-Medina's background, his addiction, and the desperate situation he found himself in mitigates the need for a sentence greater than time served.

### III.   Adequate Deterrence and Public Protection is Accomplished with a Sentence of Time Served (18 U.S.C. § 3553(a)(2))

Mr. Gamez-Medina respectfully argues that the sentencing guidelines do not take into account the ultimate deterrent, and means of public protection, in this case—deportation. Furthermore, the six months Mr. Gamez-Medina has spent at Santa Rita Jail, a notoriously inhospitable jail, have sufficient deterrent value.

Mr. Gamez-Medina understands that he will be deported, and if he makes the mistake of returning to the United States, he will face new federal charges and supervised release violations. Six months in jail, immigration detention, deportation, and the threat of severe consequences for re-entry hold significant deterrent value. Additional time in custody is not needed for adequate deterrence in this case.

Furthermore, six months at Santa Rita is a significant punishment and adequate deterrent. Defendants routinely request to go to sentencing as soon as possible to escape the conditions at Santa Rita in favor of a federal prison. The only reason Mr. Gamez-Medina did not follow this trend is because he hoped to be released pretrial to spend some final time with his partner and young daughter before inevitably being deported. Unfortunately, his brother, who has immigration documentation and is therefore a suitable surety, was not able to make it to the Bay Area to sign his bond. Waiting on this hope, Mr. Gamez-Medina spent a significant amount of time in custody pretrial. The past few months have been especially onerous at Santa Rita. *See* '*This Jail Runs on Slave Labor*,' East Bay

1  Times (October 2019), https://www.eastbaytimes.com/2019/10/30/this-jail-runs-on-slave-labor-

2  inmates-stage-hunger-strike-work-stoppage-over-bad-conditions/. The jail is struggling under the

3  weight of the additional defendants brought by FITT, many of whom have remained detained because

4  of their lack of ties to the community and noncitizen status. Cleanliness is entirely forgotten; bunks

5  and pods are filthy, yet inmates' requests for cleaning supplies go unanswered. On one occasion,

6  even Mr. Gamez-Medina's requests for replacement toilet paper were ignored. When medical

7  attention is requested, it is often not provided.

8         Mr. Gamez-Medina has minimal communication with his loved ones, burdened by the reality

9  that one phone call costs four dollars. This lack of meaningful connection to his loved ones has led

10  Mr. Gamez-Medina to become depressed during his time at Santa Rita. *See* PSR ¶ 46. He no longer

11  speaks with the other inmates. *See id.* Mr. Gamez-Medina describes Santa Rita as the worst facility

12  he has ever been in. Even considering his impoverished childhood in Honduras, six months at Santa

13  Rita have left a mark on Mr. Gamez-Medina and are sufficient to deter him from future crimes.

14         Mr. Gamez-Medina recognizes the harm his mistakes have had on the broader Tenderloin

15  community, and on his ability to be the provider to his family. *See* Whiting Declaration, Exhibit A.

16  Mr. Gamez-Medina does not want to risk another arduous trip to the U.S. to face significant

17  consequences. Instead, he plans to remain in Honduras, where he now feels he will not be targeted to

18  join gangs given his age. He will find a job to provide financial support for his family and try to work

19  with animals, as has always been his passion. *See* PSR ¶ 43.

20  **IV.  Given the Kinds of Sentences Available for Mr. Gamez-Medina, A Sentence of Time
21       Served Would Avoid Unwarranted Sentencing Disparities Among Similarly Situated
         Defendants (18 U.S.C. § 3553(a)(6))**

22         The imposition of a sentence greater than time served would create unwarranted sentencing

23  disparities in two ways. First, it would impose a sentence much greater than those received by

24  defendants in recent analogous cases in the Northern District of California. Second, it would amount

25  to differential treatment compared to similarly situated citizen defendants given that Mr. Gamez-

26  Medina is ineligible for sentencing alternatives because of his immigration status.

27         Defendants in strikingly similar cases arising from FITT have received sentences of time

28  served. The following cases are instructive:

- *United States v. Wilfredo Cabrerra*, CR 19-452 WHO. Mr. Cabrerra was convicted of selling $17 worth of heroin. He has three prior drug sale convictions, including a four-year prison sentence, as well as six prior deportations. Judge Orrick sentenced Mr. Cabrerra to credit for time served (effectively four months).

- *United States v. Pedro Anibal Anariba Muncia*, CR 19-428 CRB. Mr. Muncia was arrested for a $20 heroin sale. Arresting officers found $996, 37.3 grams (gross) heroin, 35.3 grams (gross) cocaine base, and 33.1 grams (gross) crystal methamphetamine on Mr. Muncia. He previously received a federal sentence of 180 days jail for distributing controlled substances, after which he was deported. Following the government and defendant's recommendation, Judge Breyer sentenced Mr. Muncia to time served (effectively four months).

- *United States v. Raul Luisa Ortega*, CR 19-483 EMC. Mr. Luisa Ortega was arrested for a $16 cocaine base sale, and officers found heroin in his pocket. He had two recent prior convictions for drug distribution in the Tenderloin. He was on state probation at the time of his arrest. Judge Chen sentenced Mr. Luisa Ortega to six months.

As in the above cases, Mr. Gamez-Medina here engaged in low-level drug sales in the Tenderloin. Sentencing Mr. Gamez-Medina to time served is the same sentence received by Mr. Luisa Ortega (six months), and two months more than the sentences received by Mr. Cabrerra and Mr. Muncia. To avoid unwarranted sentencing disparities among similarly situated defendants, the Court should sentence Mr. Gamez-Medina to time served.

Furthermore, since Mr. Gamez-Medina is not a citizen, he does not have the same access to preferable alternatives to incarceration, like community confinement or home detention. *See* U.S.S.G. § 5C1.1(d)(2). Alternatives to imprisonment, like substance abuse treatment, are especially important for defendants whose crimes are intimately tied to untreated addiction. Mr. Gamez-Medina has been an addict for nine years and has never been given an opportunity to rehabilitate. Mr. Gamez-Medina should not receive a custodial sentence that is longer even than most residential treatment programs available for U.S. citizen defendants. Additionally, the unusual consequence of deportation mitigates the amount of imprisonment necessary to punish as compared to citizen defendants. *See Jordan v. De*

*George*, 341 U.S. 223, 232 (1951) (Jackson, J.) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts.").

**V.    A Sentence of Time Served Is Cost-Effective, Considering Mr. Gamez-Medina's Inevitable Deportation.**

With Mr. Gamez-Medina's inevitable deportation, a sentence of time served will save taxpayers' dollars without threatening public safety, *see supra Section II. See United States v. Loaiza-Sanchez*, 622 F.3d 939, 942 (8th Cir. 2010) (Bright, J., dissenting) ("[L]ong sentences for illegal aliens punish not only the defendant but the American taxpayer. 'It would be more sensible to give . . . a stiff, but shorter sentence and then to promptly deport him . . . .'" (quoting *United States v. Chavez*, 230 F.3d 1089, 1092 (8th Cir. 2000) (Bright, J., concurring))); *United States v. Maldonado*, 242 F.3d 1, 2 (1st Cir. 2001) (referencing a statement by the district court that "the real reason I'm going to depart downward here is because I don't want the taxpayers to pay for him unnecessarily."). Cost-effectiveness during the federal government's current FITT campaign is especially important, in light of the accompanying increased rates of imprisonment of defendants pre- and post-conviction.

## CONCLUSION

For the aforementioned reasons, the Court should sentence Mr. Gamez-Medina to time served, effectively six months' imprisonment.

Dated:      February 21, 2020                    Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S
SOPHIA WHITING
Assistant Federal Public Defender
HOPE GOODMAN
Law Clerk